We'll now hear the case of Smithkline Beecham Corporation v. Abbott Laboratories. Counsel? Thank you, and may it please the Court. My name is Lisa Blatt, and I am here arguing on behalf of GlaxoSmithKline on the Batson issue. My co-counsel, Mr. Hennigan, will be addressing the merits of the three claims. Our position Is that you've divided your time and you'll keep track of that? Yes. Thank you. Thank you. So as to Batson, our position is that the Equal Protection Clause bars using perimetry challenges to disqualify gays and lesbians from jury service. Back up for a procedural question. If you prevail on your Batson question, does the whole trial get reversed, including the piece that you won? Yes. Under Edmondson, the claim in that case, Judge Berzon won a judgment of $70,000. He was the prevailing plaintiff and was entitled to a new trial. So when you have a structural error in a civil case, the party that prevails on Batson gets entirely new trial on all three claims. So as to this issue and the whole theory behind perimetry challenges is a person can be struck from a jury for belonging to a group if the group is subject to traditional, rational basis review. And here's why. Group classifications that are subject to rational basis classifications involve diffuse and ill-defined characteristics that the government may legitimately use to distinguish people. But sexual orientation, like race and gender, is both immutable and has nothing to do with a person's ability to be a juror. But are we – I mean, it just strikes me that there's a slight apples and oranges between what governs rational basis versus heightened scrutiny review for other purposes and what you would really want to use in Batson if you weren't tied into some structure. And so the question is, are we tied into a structure? I mean, is it necessarily the case that we have to put this into a category before we can decide the Batson issue? A generic category that would apply to other things as well. No. So that's the good news about this case. You don't have to decide anything other than sexual orientation does not fall into traditional, rational basis review. You don't have to decide what it does fall into. You just need to know that it's not traditional, rational basis review, because that's what protects the ability, and that's what's the only thing that's allowed under the Equal Protection Clause for peremptory challenges. Kennedy, by that, do you mean that you're suggesting some form of heightened scrutiny that doesn't fall into the traditional categories of strict scrutiny or intermediate scrutiny? Well, anything, I mean, just if you look at WIT, when WIT tried to analyze what Lawrence held, it held, we just, these were your words, that it's not traditional, rational basis review. Now, you went on to try to cabin it into the United States v. Sell case, and I don't even know what that case stands for, but it's not any cognizable standard of review. So, no, you don't have to put it into a particular category to decide that sexual orientation, like race and gender, can never be a valid consideration for striking someone on a juror. Where do you get this? Do you get this from Windsor or? The position about peremptory challenges, you get from the review, you get it from, I mean, all of the Court's cases on gay rights, but at least as far as Windsor is concerned, it certainly frees this Court from this Court's decision in WIT. In two very significant ways, and the first is, is that just as Lawrence makes clear that something more than traditional rational basis is required for infringements on liberty, Windsor makes absolutely clear that something more than traditional rational basis applies for equal protection, because under ordinary rational basis, two things are clear, and you said this in WIT, a court ignores, completely ignores the harm suffered, and the court must uphold the classification if any conceivable or post hoc rationalization can justify the law. Windsor, of course, does neither of those. The court heavily emphasized the demeaning effect that DOMA had on gays and lesbians, and equally conclusive and more importantly, the court does not even purport to examine all the many numerous possible justifications for the law. And so in short, the mode of analysis, if you will, in Windsor just forecloses, I think, any argument with a straight face that that court was applying traditional rational basis review. Now, there's yet even a second independent reason why Windsor frees this Court from WIT. If you look at WIT, this Court, the holding assumes that the liberty interest that was recognized in Lawrence is fundamentally distinct from the equal protection clause, and that you could have some sort of heightened scrutiny for deprivations of liberty, but a lesser standard for deprivations of equality. Now, that position is just no longer tenable after Windsor. The entire opinion of Windsor in sentence, word, chapter, and verse treats equality and liberty as inexorably intertwined and mutually reinforcing, and that is because the fundamental right to form same sex relationships is just inseparable from one's a gay or lesbian. And so just as you need a higher standard for deprivations of liberty, you can't have a lesser standard for deprivations of equality. And your entire gay rights precedents, from whatever, Beller, that original case, all the way up through Phillips, assumed that the standards need to be equal. It's only in WIT that you broke them apart. You always had rational basis for both deprivations of liberty and equality. WIT tried to say, well, they can go off in different directions. And I think that that argument is basically silly now in light of Windsor, which I think builds on CLS, it builds on Lawrence, that these two concepts, at least in the context of sexual orientation, are just inseparable. If I can just get back to the underlying theory of Batson in terms of a parentory challenge, and that is when you do strike someone based on this characteristic that's immutable and that has nothing to do, even conceivably, with a person's ability to serve as a juror, what it means is when you see a parentory challenge based on sexual orientation, it means that the only thing it can be explained by is reflecting either historical prejudice or illegitimate stereotypes. And so of course this is just to say something obvious, but because parentory challenges are often based on stereotypes and perhaps not necessarily rational ones and predictions that may or may not be accurate. And that's why there's an instinct that if you're not going to abolish parentory challenges altogether, which might be a good idea, you have to narrowly cap it. Right. So parentory challenge is a very unique area of equal protection only when you look at, under the Equal Protection Clause, you have a class of one. So you cannot discriminate against me because just pure animus against Lisa Blatt. But on the parentory challenges, we accept as a rational system as a whole for traditional rational basis classifications, even though an individual circumstance of a parentory challenge may be based on an irrational prejudice or animus, the classification involves legitimate considerations about a person's ability to perform or it's a diffuse, like disability and elderly. These are very ill-defined terms. Who knows who's in them? It's massive categories. Someone's blonde or the hippies in Moreno. These are all variable characteristics. What about Catholics? Excuse me? What about Catholics? So Catholic is a religion, obviously, and most of the courts would say religion is protected under Batson. But religion, at least, is there's a separation between somebody who's Catholic and a religiosity. So if you have someone with lots of crosses or a yarmulke, you could say, well, I can see that person is Jewish and there's a distinction between the affiliation or the status and does this person have predetermined views because they came in with lots of crosses or a yarmulke. And so courts have said, well, we'll let the affiliation be subject to Batson. But there's no such thing as a black view or a gay view or a female view. We don't allow those stereotypes. And you might have a set of beliefs associated with being Muslim or Catholic or Jewish. You just don't have that with an immutable characteristic like sexual orientation. And so what Abbott's position, and it's really offensive, it brands gays and lesbians as with a judicial stamp of inferiority by deeming them unfit for jury service. It's demeaning and the open and public character. It heightens the injury. And as this Supreme Court has repeatedly held, it's actually a call and a stimulant to further prejudice when the judicial system puts an imprimatur behind saying it is okay to have state action and saying someone should not be able to serve on a jury purely because they are gay or lesbian. If I could just turn to just a couple of minutes on why Batson was clearly violated in this case. I would also appreciate some comments on the practicality of all this. Sure. Privacy interests in. Absolutely. So our position is basically what, I mean, there are now 10,000 Department of Justice lawyers following Batson. And, of course, that's every Federal criminal case in this country. So, and it would apply just like it applies to Arabs and Polish people and Italians and Native Americans. You don't go around asking people, hey, you kind of look Arab. That just doesn't come up in jury selection. So this only applies when you could make a prima facie case because someone has self-identified as either Native American or gay. And like you had in this case, the person self-identifies as gay. The Batson challenge is called. The judge asked the counsel to give a neutral reason, and he expressly declined to do so, and instead denied that he thought the person was gay. And then when he was told, hey, the person talked about his male same-sex partner, he said, well, hey, it's only my first strike, so that's not a problem. So there's no question that this is a prima facie case. You might have a problem. Sotomayor, is it enough that he self-identify, or are you also arguing that there must be some motivation in terms of the nature of the case that's apparent? You apply it exactly like you would apply it to someone who's Native American or Arab. You have to make out a prima facie case, counsel has to give a specific reason, and then at Step 3, you have to find the connection. But I think Judge Schroeder is asking what made out the prima facie case here. The self-identification, the fact that Abbott had an obvious motive for striking people in the gay community, because the allegation is Abbott's counsel was defending a client that was accused of manipulating the price of AIDS drugs, which had spurred outrage in the gay community. And even if we didn't have that, you have Supreme Court case after Supreme Court case saying when you try to give a reason, that in and of itself can give rise to an inference of discriminatory intent. And the fact that his three reasons. Kagan. Presumably, if they had gone farther on questioning him and had said, well, you appear to be a gay man and essentially what you just said, you know, this has been, have you heard about this uproar over such-and-such and does it upset you? And if he had said yes, they could have struck him. Yeah, but you don't get to say you appear to be a gay man. A gay person or straight person can have feelings and opinions. And what counsel is entitled to do is say, do you have an opinion about this case? And that was asked. I mean, that's the beauty of why this is such a bad case for Abbott. In Johnson, the judge said, I'm not going to let you ask anything about the juror. He served on a false arrest case. I'm not going to let you ask anything. And so the court said, look, that was a good reason to strike. Abbott's counsel had free reign with this juror. And every single answer was, I don't know anything about Kalatra. That's all he said. And so there's no reason in the record. And even if there was a reason, one would have to ask Abbott's counsel, why didn't you give it? And so any person looking at what Abbott's counsel would do would say, had counsel had a good reason, maybe he should have given it. And since the judge said the better part of valor might be to give it. Well, but she made essentially, or at least two and maybe three erroneous legal rulings before he stood up. Right. And given those rulings, he really didn't have – he was sort of permitted to do it, but he didn't have much of a reason to do it, because he'd already been told for two and maybe three reasons she's not going to recognize this challenge. So why shouldn't he get another shot? Judge Berzon, any lawyer should have said, I could appeal-proof this by just giving a reason. And it's a little bit more than ironic that they now call them neutral and obvious, yet they weren't so obvious that it didn't come to him to say it at the time. And let's look at the three reasons which are really bad. Let's talk about them. The first one he offers is that the guy worked at the Ninth Circuit doing computers. Okay. Abbott doesn't give you any legitimate reason why that matters. They left two lawyers on the juror. They left people on the juror who knew people in the legal field. And it gets worse from here. If I could – Judge Rotherham. It gets worse from here. The second one on, well, he heard of Kalatra. Okay. Well, what does that mean? He says, well, what do you know about Kalatra? And the juror says, not much. Okay. The third one, which I think is the worst for Abbott, he says, well, we speculate now in our brief that he may have lost friends to AIDS. And yet, again, it would seem to be highly not obvious if we're having to speculate. And when you look at the transcript of the voir dire, he says, I had friends in the past who were diagnosed as AIDS. So we don't know what – Did this happen before Windsor? Yes. Yes. Windsor was – well, Windsor was decided two months ago, but it was in 2011. So this was two and a half years ago. No, but before the district court in Windsor. Well, I don't know. There were various district courts. First Circuit in Glenski. The district court in Perry. Judge Walker Perry? Yeah. What's been after that? I don't remember. It was in February. We could check. It's like February. But that's another reason why you don't go back two and a half years from now. And in Snyder v. Louisiana, United States v. Atlantis, these are – that's your case. This Court has basically said where it's impractical and after the passage of time or just we can decide on the record, step three. Well, what I'm wondering is what – how the district court erred two and a half years ago before Windsor when no court in this circuit – when this circuit had not recognized this classification. I just – it strikes me as – Because that's all appeals. So every appeal, every Supreme Court case follows on anything on direct appeal. So whenever you appeal a case, you're allowed to, A, make new law. That's the definition of an appeal. I mean, technically, if we lost this case, we could go to the Supreme Court and then they – that case would decide it. But that's just the nature – let me just give you the example. Batson itself, there was no – there was just the Swain v. whatever it was, the one that you had to show it. So in Batson itself, he made a Batson claim. It was rejected. And the Supreme Court said, no, we're going to – you can't do that. Well, that's true. But we had lots and lots of law with respect to blacks being a protected class. Okay. But the first time they recognized it with ethnic groups and the first time they recognized it with women. And in JEB, they were trying to figure out whether women were class. But a better answer is this. I don't even think WIT or Windsor is what you needed. Before WIT, WIT just says Lawrence is not an equal protection case. So we're just going to leave our gay rights cases as they are. And you – there's a case on point, Phillips, with banning military and the gays. If we didn't have Windsor, I'd be making two very good arguments on why WIT wouldn't be binding. We don't know what the standard of review is pre-Windsor when we have cases like this Pruitt v. Cheney case that called it active rational basis. So even then, your Ninth Circuit case law distinguished between traditional rational basis and active rational basis. But more importantly, your entire gay in the military case law was based all on homosexual conduct versus homosexual status. And it being very clear in Phillips, the court used the word homosexual conduct 17 times, saying we don't under – you can uphold the military policy because it bans conduct. Of course, status is different. And so in light of CLS v. Martinez, we know that distinction is invalid. So if you had a case under gay rights today, your case law would be – you'd have to just erase it and start from scratch. Do you want to comment briefly on whether, if we agree with you in principle, the case should be remanded since the district judge didn't make a ruling at the third step, or whether you should prevail? Absolutely, you should not give counsel a second bite at the apple when he made a tactical choice. If the judge had said, Mr. Weinberger, you might have a reason, but I'm not going to let you give it because I want to go up on my gay rights case, and don't you dare open your mouth, instead, she said, on the better part of valor, do you want to give a reason or do you want to run with me on appeal? You can just stay. You can stick where you are. So you don't give them a second bite at the apple. And the third, for step three, it's just impractical. I don't even see in Abbott's brief saying that Mr. Weinberger kept contemporaneous notes and he's ready to go back on remand and say, oh, I have right here in my notes. You can't make – it's clear under your case law, post hoc rationalizations won't work. It has to be the actual reason that motivated the lawyer at trial. He was given that opportunity and he blew it. You don't give him a second chance. Imagine if this were a Title VII case and discrimination, and the judge said, you know, I don't think they made out a prima facie case, but do you want to give a reason or just let's go up on my prima facie case? And the employer says, hey, this sounds good. Let's go up on the prima facie case, because if we lose that, I've got two and a half years to come up with a reason on why I fired you. I don't think any court would let a lawyer get away with that. It's basically, he defaulted. Suppose the district judge didn't make a ruling at step three, went back on step three and considered the record. Right. Well, that's a good question, because what happens when you have purely your prima facie case and nothing? And that was the Paulino v. Harrison case that this Court had. And you held that it was permissible, obviously, to call that a – to make a finding on step three. Here, I would say under the Atlantis case, A-L-A-N-I-S, that the Court had said, yes, of course we normally let trial courts do this, but after the – on this one, we can see we have a prima facie case. We have a bunch of pretextual answers. There's enough evidence. We're not going to go through the rigmarole, and I think it would be particularly unfair. But I think that's a pretextual answer to say to a judge, I agree with you. That's the question. I agree with you. I didn't know he was gay, even though he said, like, he, five times after his partner. And then he said, hey, it was just my first strike. But what is also pretextual, that at least gives rise to an inference that a reasonable person would think, had he had a good reason, he might have given it. But the three reasons they offer on appeal are pretty bad. The one about the person who died, well, maybe his friends might have died in the past. Mr. Weinberger says to the juror, who apparently has the dead friends, well, what kind of medication are they taking? What kind of medication are they on? So he obviously thought these friends were still alive. So I think he's going to have a hard time on remand going, well, I thought they were dead, but I don't know. This wasn't a gay case. It was just a case between two drug companies. Yes. And one of the prospective jurors had friends who died as a result of taking the drug. Now, here I understand there's no record that he knew anyone who died as a result of taking the drug. But if a prospective juror said in a case between drug companies, oh, yeah, I had two friends who died as a result of taking the drug, I don't think you as a lawyer would want that prospective juror on the case. Right. But let me give you the other one. Yes. But let me try this one. Your Honor, I'd like to strike that juror not only because he's biased against my client, but he's also black. You can't do that either. So just because you have a neutral reason for striking someone, if someone has a primifacious case of a racial animus or a gender animus, then they have a primifacious case. Now, the judge might think, okay, and then we get into a whole motivating factor, which factor did it? Was it because he was black? He said he was black. But the fact that they you can conceive of another case where you might have a reason to strike someone, it's just it's part of the totality of the circumstances in any case. The juror in your case probably would be struck for cause. But under Batson, you cannot strike the person as a factual matter, just like in a Title VII case, because you have an improper intent. If I could, I'd like to serve to reserve the remaining time for rebuttal. Thank you, counsel. Good morning. May it please the Court. My name is Daniel Levin, and I'm here for Abbott Laboratories. Your Honors, this Court doesn't need to reach the underlying constitutional issue. It's unnecessary to do so for two reasons. Number one is that there's no prima facie case, and number two is that all of GSK's claims failed as a matter of law and never should have been submitted to the jury. And I'd like just to spend a couple minutes on that point, too, before turning back to the prima facie case. This case was in this Court before. In the Doe case, the antitrust claims, and the Court held that the antitrust claims couldn't proceed. As a matter of law, they failed. The same conduct, the Norveer price increase, is what's at issue here, and that conduct just isn't an antitrust violation under Doe and under Linkline. It's not. There's no refusal to deal in the Norveer market. There's no predatory pricing in the Boosted market, the Calitra market. And what you can't do, what Doe and what Linkline says, is you can't do what GSK's whole theory was premised on. You can't take the two prices and take two fair pricing decisions, combine them in and say there's an antitrust violation. So the antitrust claim, it's controlled by Doe. It fails as a matter of law. And by the way, Your Honors, that, the jury, we won on that point. This Court can clearly affirm the jury's verdict on any basis supported by the record. The antitrust claims on that basis can be affirmed totally independent of the market. That wasn't the jury's basis, though, right? Well, the jury checked the first box, no, which was relevant market. The jury said there's no relevant, you failed on relevant market. So they didn't reach anything else. The same is true with respect to the State law claims. They fail as a matter of law. I'll just briefly address the implied covenant claim. That claim fails for two reasons. Number one is that there is no implied price term. There's no implied term for a certain level of profitability. This is a simple patent license. That's all it was about. It didn't control price. And number two is the exculpatory clause. This is just a breach of contract. There's no such thing as a reckless breach, an intentional breach. A breach is a breach. And it's controlled by the exculpatory clause. Well, it's a New York State law, and that is fairly confusing, I think. I mean, the cases sort of use a lot of loose language about gross negligence and so on, not saying that it can't be gross negligence as to the breach of contract or as to the violation of the contract. I mean, I understand that that's peculiar because people are always breaching contracts intentionally and otherwise. But they don't – the case law seems not very focused on that problem. Your Honor, I don't disagree that case law is confusing. But the theme that runs through it is this underlying public policy. It's well-established in Corbin, it's in Williston, and the public policy is what you can't do is you can't contract to absolve yourself of future tort liability for gross negligence or intentional torts. That's the black-letter law in this area. It has nothing to do with breaches of contract. And it doesn't make sense – and New York law is clear on this point of the Metropolitan Life case. It's clear that you can't – there's no distinction in New York contract law between different mens rea as a breach, as a breach as a breach, whether it's an accident or whether it's intentional or somewhere in between. Kagan. And there's also the fact that here we have a breach of the – I understand you're challenging it, but a breach of the implied covenant of good faith and fair dealing, which suggests that there was bad faith. So it could be that this particular violation is special in that regard. But not with respect to the breach, because the implied covenant is still a contract theory. I understand that. They don't have a viable tort theory. The cases that have gone forward in this area, there's a tort theory there. There's a theory of an extortion theory. But they don't say that. I mean, even the one about the fire. I mean, the fire was a breach of contract, not reported. But it's – what they say in Summers is that it owed a duty, that the alarm company owed a duty. Where did the duty come from? I mean, I don't have a duty to report a fire necessarily if I'm walking down the street, do I? Well, but the duty came from – it's a duty, frankly, probably to the people. They had knowledge – let me put it this way. They had knowledge about a fire, a potential fire at a building where there's people in the building. Where they had a contractual obligation to report it. They had the contractual obligation, but there's also this theory of – they don't – they talk about a breach of duty independent from the contractual obligation. So I think there's a difference between Summer and what went on here. Kennedy, I want to make sure we all understand where we are in this argument. Your argument has to do with the merits, but also a defense to a Batson violation. Each side has 30 minutes. Your opponent took 23 minutes, I believe it was, talking just about Batson and not about this issue. You understand that your 30 minutes goes to everything. I'm going back right now to the Batson issue. No, no. I'm not suggesting you switch. Your argument is that. I understand. I understand, Your Honor, that we're talking – that I'm doing everything. I only wanted to start there because these are important issues in the case and there is no point in – even if this Court were to say, well, we're going to do this, even if this Court were to agree with the other side that there's a Batson violation, there's no reason to send this Court back for a trial. We'll be back here in three years talking about whether the antitrust claim fails as a matter of law. No, no. I understand. I wanted to make sure that your argument was – You know, I – yes, I'm here for everything. I've got it all on my plate. But let me turn to the Batson with that, because I want to spend some time on that. In particular, I want to spend some time on the Prima Facie case, because this Court, as it did in Osazua and as it did in Campbell, doesn't need to reach the underlying issue because there isn't a Prima Facie case here. What the Court said in Campbell is if there are obvious neutral reasons on the face of the record, that that – that is sufficient to defeat the Prima Facie case. And here, there's at least three obvious reasons. This juror worked at this Court. That's different from just being a lawyer 20 years ago or being a French lawyer or happening to know a lawyer. He had the sort of imprimatur, if you will, of affiliation. But we can't – I mean, just to position us further, you're sort of taking the reasons on the record and backing them up into the Prima Facie case, which is not the way we usually do this. Your Honor, what the law is absolutely clear that you look at the totality of the circumstances. You look at the whole record and ask, does an inference of discrimination arise from this whole record? It's exactly what the Court did. But generally, the inference, it's kind of like McDonnell-Douglas. It's not a very strong inference. It's a burden, because it only shifts the burden going forward, and it's only a method toward finding out about what was really going on in somebody's mind. It's not – and so it's been treated, as my understanding in the case, relatively loosely. It's less than a preponderance. That's what the Supreme Court has said. But it's not nothing, because this Court has repeatedly said in cases where it's looked at the totality of the circumstances and said there just isn't a Prima Facie case here. And there's at least three reasons. For example, give me an example. That's what the Court did in the Vasquez case. It's what the Court did in the Wade case. But as to facts, I mean, here we have a person that, if one accepts that this is a viable class for bats and purposes, we have a person who is in the class. We have a pretty good connection between that class and the case. Go ahead. The Campbell case, I think, is the best example, because it's a case, a sexual orientation case, where they assumed on appeal that the juror was a member of the class, and they looked at the record, and the obvious reason that they identified was that this juror had had prior jury service, and they – there was no information – they had reached a verdict, but there was no information about the verdict that had been reached, as distinguished from another juror who was seated, who also had prior jury service in a similar case, and who had reached a defense verdict. That was the obvious neutral reason at the Prima Facie step. That reason pales in comparison to what we have here, because the second reason – let me turn to this, and this is important – is that he had heard of Kalitra. And it's significant when you look at this record. When Mr. Weinberger stood up to do attorney voir dire, he had 20 minutes. There were 27 jurors left in the pool at that point. Four of those jurors had indicated that they knew or had known someone who had HIV, and he inquired of every single one of those jurors about drugs. Did they know about the drugs? And the only person who said that they had heard of a drug that was at issue in this case was the juror B, the only one out of four. And he asked that of every juror. It's apparent from that record that that was meaningful. And GSK stands up now and says, you know, we look at these reasons. They aren't good reasons. They're bad reasons. But that's not what we're talking about. Kagan. Let me stop you for just a moment, because I want to make sure that I understand the record. Are these the reasons that were provided at trial? No. No reasons were provided. These are the reasons that are in the brief? These are the reasons that we talked about in the brief. These are the reasons at step one from the totality of the circumstances. That's what we're talking about. So a lawyer can say, I'm not going to provide any reasons because I think that I'm correct as a matter of law, and then he can go back, consult with all of his partners, and they can go back and look at the record and say, oh, these are the reasons I would have given if I had wanted to. Let me what's clear in the case law is that if there's an erroneous step one ruling, then there's a remand. That's what the Court said in Collins. You go back and you do steps two and three. What we're doing here is we're not proffering, we're not proffering step two reasons on appeal. All we're doing is looking at the face of the record, at the face of the record, which is what the Court said you do, what the Court did in Campbell, and look at the totality of the circumstances and say what came out during voir dire. We're not talking about subjective reasons that might be proffered at step two. We're just looking at the record. But the district court didn't say that either. She didn't say there wasn't a prima facie case. She just never decided it. She ruled as a matter of law. She ruled as a matter of law. That's correct, Your Honor. She ruled as a matter of law that it didn't apply. And what Mr. Weinberger said is I'll stand on those reasons. Let me finish the prima facie case, because I want to turn to then to what he said and why that wasn't a step two reason. But I want to emphasize that what's important about the looking at the record is you don't go back and you don't sort of second-guess and say, well, that doesn't seem like a valid basis. What Judge Fletcher said, and it's in the way of the opinion, is he says, I doubt I doubt our ability to go and figure out who's a good and who's a bad juror. But what's apparent from the fact that Mr. Weinberger asked this of every juror is that this mattered. And because it mattered, and juror B was distinguished from every other juror on this issue. Whether it's a good or bad reason or whether, you know, he didn't know too much about Kalischer, that's not important. It's that this issue, it's apparent that it was important because it was asked of everyone, and that's enough. But let me turn now to what Mr. Weinberger said. When you're given an opportunity to say what the reason is, and you know that that was he was the only one who didn't, who knew about the drug, and then you're asked about the reason, and he doesn't give that as a reason, that's of no significance? Well, he doesn't give a reason. He never he's what he's what he's Well, he says, I didn't know he was gay, which was not correct unless he wasn't terribly bright. I can't imagine that. And then he says, well, I'll stand on your reasons. But if this was so important, wouldn't you expect him to say, well, he's the only one who knew about Kalischer? Because, Your Honor, he's not required to give a reason. He's he's what he what what he's handed is, let me let me walk through a little bit because it's important to understand. The problem is that if you do the the Batson analysis the way you're suggesting, and as I said, back up the third prong into the first prong, essentially, you're letting go of the procedural protections that that Batson meant to provide, i.e., the requirement that that reasons be articulated and then tested. This way, you're looking you're asking us to look at it in a circumstance in which there were certainly circumstances from which one might infer, but if there was an opportunity to rebut the the inference, you're saying, asking us that despite the fact that those reasons were never articulated, that we're supposed to sit now in a cold record and make inferences about what reasons there might have been when the reasons usually are used in Part III, not in Part I. We're not asking you to back up and do the Step 3 determination. You are. No, we're just asking to look at the totality of the circumstances. Well, then what is it and the main circumstances are what might have been the reasons? The main circumstances are what came out in the voir dire, and that's distinct from what might be offered when someone stands up and gives reasons, because they might give reasons that aren't apparent, say, from the transcript. So what's important at Step 1 is what, when you look at the whole record, and that's important because it's crystal clear from the case law, from the Vasquez case and on, that the first step of Step 1 is, is the juror a member of the protected class, and that is clear. But isn't Batson about discrimination and trying to avoid discrimination on the basis of category? And isn't that doesn't that go to intent or motive? Ultimately. Ultimately, it does. It does. And the question is at Step 1, is there, when you look at the whole record, is there an inference? Can you draw the inference of discrimination? And just the fact that the It says, though, that I'm not going to provide any. Well, you're back at Step 1 and saying that there's no inference. Because we never got to Step 2. And we, I don't know whether he's gay is not a reason. It's not an explanation. It's a question about whether he's in the protected group, which is a Step 1 question. It's not a reason. It's not a reason as Well, I said Step 2 is a reason. He's saying I didn't, certainly I wasn't being discriminatory. I didn't know he was gay. That's the Step 2 answer. But that's not what he says, Your Honor. He says, he just says, I don't know whether he's gay. He says it immediately after he says, I'll stand on your reasons. I'll stand on your reasons. And to say that his statement that I don't know is an explanation, it's not an explanation. The cases that they rely on are cases where someone denies a discriminatory motive and says, I didn't strike that gerb because they were African-American or because he was a woman. That's a very different thing. That's clearly what he was saying. He's saying I didn't know he was gay with the obvious inference that, therefore, I couldn't have struck him for that reason. Your Honor, that's simply not the case. And it's important to look at how this developed. If you see the way the challenge is made, Mr. Saverio, it's on the ACER, the Appellant Supplement, it's at 319. What he says is, Your Honor, the preemptory challenge of someone who is, who I think is, or appears to be, could be homosexual. And then the Court gives her reasons, and then she says, and she says, there's no way for us to know who is gay and who isn't here, and then she says, after the three reasons. Sotomayor, what about him? She's talking about the difficulty of doing comparative jurors. She's talking about the difficulty of doing comparative juror analysis. And then she says, if you don't want to, you can stand on my first three reasons. And he says, I will stand on the first three at this point. I don't think the challenge applies. I have no idea whether he's gay. And it's after that, it's after that, that then Mr. Saverio stands up and says, well, in fact, he sat on voir dire and reminds the Court. But this is nobody – it wasn't that he stood up and said that first. It wasn't – it's imputing to Mr. Weinberg that he picked up and heard during voir dire that he said he – we're not disputing an appeal. Are you at some point going to address – well, two questions. One is the larger question of is there a protected class here or do we have to decide if there's a protected class here, or how do we decide whether that applies to this group at all? And second of all, what if we thought there was a – at least a prima facie case, what do we do next in this case? Well, let me take – let me take the second part, and then I'll go back to the bigger constitutional issue. If the Court were to determine there was a preemptification, we disagree. But if it were, it's clear that the remedy is to remand. That's what this Court said in Collins and what's said in Paulino. It doesn't do – it has to give an opportunity for step three. There was an opportunity. This case is odd, because there certainly was an opportunity. But he didn't take it. And that's important, because in Hernandez, what the Supreme Court says, if you move to step two, you waive the preemptification case, you waive step one, you're done. So litigants can and sometimes do say, I'll stand on the prima facie case, I'm not going to move to step two and give up that. He didn't say that, either. He didn't stand on that. Of course he didn't say that, but that's what – that's – he wasn't – step two has to be – you have to be given a real opportunity. What he says is, I will stand on your first three, and those were the legal reasons. Those were, that's and doesn't apply. I'll stand on your first three. And to say, well, then he immediately – without saying, and you know what, Your Honor, I'm actually going to move to four, he just says, I don't know. And I don't know is, I don't know if he's in the class. I don't know if he – if there's even a prima facie case here. It's just not a step two reason. It's not, I struck him because, I struck him because of this or that or the other. It has nothing to do with that. It's just, I don't know. And that's not – it's not a reason. In fact, it's apparent from what GSK is saying, because they stand up and say the same thing. They said – Kagan. Assuming it's not a reason, he had the opportunity to give a reason. And the question is, does he get a second opportunity? And the answer is yes, Your Honor. Yes, because if you don't move to step two, the answer is you remand and you do step two and three in the district court. That's what the Court has said. It's what's said in Collins. It's what's said in Paulino. Let me then move to the underlying issue for a minute. It's clear to me. Kennedy. I'd like to just ask you one thing before you get to two. If the reason that he made these errors was that the Court had made errors as to the sufficient reason to remand? It's certainly – if the Court thinks that there's a sufficient basis for a prima facie case, then the answer is to remand. And the fact that he relied on the Court – if what the Court said that Batson doesn't apply, if this Court were to determine that. Remand for what, exactly? Well, then if there's a prima facie case, the remand would be for step two, and then step three, where the Court would be able to apply. But no, what is step two in this case? It would be to offer the reasons. There would be – there would be an – But he has to be offering reasons that – not reasons he's coming up with now, but reasons that he somehow can substantiate that he had then, which requires a means of doing that. Which happens, Your Honor. It's what happened in Millerell, which went back and forth to the Supreme Court. They had an evidentiary hearing. I think it was years after the trial where they – where the prosecutor stood up and said, this is what I did. But ordinarily, I mean, the one case I know about, the prosecutor had reams of notes and checks and Xs and so on, and so there was – there was a record. There was something for him to be using to refresh his recollection as to what he actually thought at the time. The Court is absolutely – the district court in that posture is absolutely able to assess. It's – essentially, it's a credibility determination, and that's what district courts do. They're allowed to look at – to look at the reasons and make an evaluation, and sometimes they have to do that after the fact. And that's – that happens, but that's not unusual. Kagan I really find that unusual, though, in the sense that he was given a chance to protect his record, to do that. Exactly that. Winsor The fact that he chose to stand on a ruling – he got a ruling in his favor. The ruling was in his favor, and to say – to say there's a requirement to say, well, I'm going to bypass the ruling in my favor and move on to protect my record, I mean, you might make a discretionary judgment to do that, but to say that you lose unless you do that, there's nothing that supports that. And it would be a very strange rule. You would constantly have litigants jumping up to say, I know you just ruled in my favor, but let me – let me, you know, give you a bunch of other reasons to protect my record. I mean, that's just not the way trials unfold. Kagan Ordinarily, but she – he was specifically given the opportunity. I mean, he didn't have to interrupt or – or assert himself. Winsor Well, but she – what she said was, sometimes it's the better part of valor to give step four, or you can stand on my three rulings. She didn't – she finished by saying, or you can – inviting him to stand on the three rulings, which he did. And to say that he's supposed to say, I decline your invitation, you know, and I'm going to take this other route. Kennedy I don't want to hold you off. Winsor Well, let me – let me turn to the – to the question of the – of the equal protection clause. Because in JEB, what the Court said is, if rational basis review applies, you can exercise a peremptory. And what this Court said in Witt is that rational basis review applies under the equal protection clause. Kagan The problem to me with this line of analysis is it's kind of a, you know, a QED or a syllogism, but it doesn't feel right. I mean, in the sense that he said the rational basis with a certain thing in mind, i.e., amorphous categories that are of the sort that ordinarily are treated in a certain way. That is, any reason will do, post hoc reasons will do, there's no probe rematesh and so on. He attached the words rational basis to that, but we don't – but to use that and then transport it into Witt and then transport it in here, it may work verbally, but it doesn't seem really to address the underlying concerns of either Batson or the recent – Winsor, you know, sexual irritation cases very well. But, Your Honor, we're operating in a system of precedent that's developed around Batson, and we're operating underneath JEB, which made, which drew this distinction between is it a suspect classification under the equal protection clause or is it a classification subject to rational basis review? But that's a dichotomy that you're creating that seems inconsistent with Winsor, for example. It's not inconsistent with Winsor. Winsor – what Winsor – Winsor doesn't apply Heiden's scrutiny. Winsor follows Romer, which is a rational basis case, which Witt describes as a rational basis case. Page 817 of Witt describes Romer as a rational basis case, and it finds that DOMA is motivated by discriminatory animus. It has no legitimate purpose. It's a similar mode of analysis, if you will, to the Perry case that this Court decided. It doesn't have to reach the question of whether sexual orientation is a suspect classification because DOMA had a discriminatory animus and fails under the Romer approach. That's not clearly irreconcilable with Witt's finding holding. It's not a question of whether there's now some tension in the case law or whether someone might, you know, postulate that there's some – something needs to be resolved. And that might be a question for the U.S. Supreme Court, but it's not a question for a three-judge panel that has to get around Miller v. Gamey. There's a clear statement in Witt that rational basis review applies under the Equal Protection Clause to sexual orientation. There's a clear statement in JEB that when rational basis review applies, you can exercise a peremptory. Windsor just isn't clearly irreconcilable with that. In Windsor, the Court said that this was demeaning to select this classification. And it didn't address, as I read it, some of the – and this is argued in the briefs – it didn't address some of the rational basis for the classification that Congress had made, and that therefore it must have been applying some kind of heightened scrutiny. Why is that not correct? Because it relies solely on rational basis cases, and its ultimate holding is that it has no legitimate purpose if DOMA, that rational basis doesn't go through. Kagan.  I mean, for example, quoting from Romer, Discrimination of an unusual character, so it's not the usual, requires careful consideration, which seems like something more than rational basis. And then he does talk about a disadvantage, a separate status, a stigma. He also talks about the fact that moral and sexual choices underlying my – lying the distinction are protected by the Constitution. So there are a series of ways in which the phraseology here, and what was actually done here, is at least not, arguably not the kind of rational basis that was meant by the statement in JDB. The careful consideration language in Windsor, which is quoted out of Romer, is quoted out of Louisville Gas and Electric, which is a rational basis case from the 20s. It's a tax case. It's been interpreted as a rational basis case, as we note in our supplemental brief. This Court has called Romer a rational basis case. It did so in the Perry decision. So to say – and I recognize what Your Honor is saying is you might have a theory, and I'm sure that people will write articles and people will talk about it, and when the next case reaches the Supreme Court, they may argue that there should be some new theory or some rational basis, different type of rational basis, or some other heightened scrutiny that is an intermediate scrutiny. People are free to make all those arguments, but nothing in Windsor is clearly reconcilable under the Miller v. Gamey standard with Witt. It doesn't – Kennedy, where it distinguishes equal protection from substantive due process. And it says that the due process issue, which the Supreme Court addressed, there you got some kind of heightened scrutiny or something, you got more than rational basis. It said for equal protection, you don't get that because the Court did not address equal protection. So that was the distinction. It's clear that if in Witt they thought they'd addressed equal protection, they would have come out the other way. But they said the Court didn't address equal protection, so we can't change what we previously said about equal protection. Now, leaving aside the fact that Witt and all the cases it relied on were military cases, and there was another reason why that could be distinguished, the question is, then, is Windsor an equal protection case? If it's an equal protection case, the same analysis would apply that the Court applied it with Lawrence to Witt. There was – had Witt considered equal protection, it would not have reached the same result in all likelihood. But now do you think we don't have an equal protection case in Windsor? Windsor was an equal protection challenge under the Fifth Amendment. But it didn't apply heightened scrutiny. That's what the Second Circuit did. And the Second Circuit held that sexual orientation was a suspect classification, applied an immediate scrutiny. That was briefed to the Supreme Court, and they didn't do it. They didn't go that far. All they did is they applied Romer, which is a rational basis framework. They looked at – they said there's a discriminatory animus, and otherwise there's no rational basis, no legitimate purpose, and they struck down DOMA. Now, it's not as thorough, say, as the Perry decision of going through every proffered rational basis and explaining why it fails, but all those – the argument that says, well, some rational basis were proffered, that's just an argument that says that the blag wrote a good brief. I mean, the Court rejected that. The Court said there's no legitimate purpose. I mean, implicit in that is all the legitimate purposes. It's the last – the no legitimate purpose is in the last paragraph, I believe, of Windsor, of Kennedy, of Justice Kennedy's decision. It's the concluding bit right before they say this applies only to these lawful marriages. That's where Justice Kennedy and the Court ends up in the Windsor case. So this Court is not free to go back and reinterpret. It's not clearly a reconcilable at a minimum with Wits holding in – I do want to make – address this military point for just a moment. Because what it really says is no – this seems to be to prove up the point that something else is going on here. The Federal statute is invalid for no legitimate purpose overcomes the purpose and effect to disparage and injure those who – so there's a balancing going on. And it is – and the – one-half of the balance is disparaging and injuring and that seems entirely different than what usually goes on in a rational basis analysis. But, Your Honor, it's the lack – it's the purpose to disparage and injure is what shows that there's a lack of a rational basis. It's a very similar mode of analysis to the Perry decision. That's not the way it reads. But that's – that's what the Court is – that's what the Court goes through, all of the reasons why Gilman was enacted, and it makes – and it finds that the purpose – the purpose is to disparage and injure. And that – and that – that, therefore, there is no legitimate purpose. The purpose – the purpose it finds, it finds that this statute had a purpose. The purpose was to disparage and injure, and that's not a legitimate purpose. But that's a rational basis mode of analysis. Kagan. It says there's no legitimate purpose. It says there's no legitimate purpose good enough to overcome the purpose and effect to disparage and injure. But that's still not – that's still not a heightened scrutiny type analysis. Then it would be a question of whether there's some compelling interest and so forth. That's not the mode that they take. They never use the word heightened scrutiny. They never use talk about suspect classifications. They simply don't go down that road. Okay. Your time has wound down, but let me ask you one – let me ask you to summarize again your position with respect to the contract damages. With respect to the contract damages, we are appealing those, and we're appealing them on two basic points, is, number one, there isn't any – any implied term that would govern price or profitability, number one. And number two, the exculpatory clause should apply. It should apply. Okay. And so the bottom line is that you want the – want us to say that the district court should have granted judgment as a matter of law on the contract claim?  Thank you, Your Honor. Thank you. Thank you. Thank you, and may it please the Court. On the no legitimate purpose, these exact arguments were made in the Witt case on Lawrence. The government said, well, Lawrence never said it was applying strict scrutiny, and Lawrence said there was no legitimate purpose, and the Court said, right, but it said no legitimate purpose to overcome the bad effects. So this very exchange was already rejected in Witt. And I also think it is somewhat – it's just insulting to all the lower courts who examined DOMA and went through the trouble of putting headings about all the conceivable justifications, like Galinsky and the First Circuit and Second Circuit. Courts know how to write a rational basis opinion, and certainly the – and you certainly did in the Perry case, and they know how to write it in Romer. Romer itself says four times we're applying ordinary, normal, conventional rational basis, and then at least it may have been a wink and a nod. I know. The government in Windsor doesn't say what it's applying. And that's exactly what the government, the Secretary of the Army said that to you in Witt. Well, Lawrence never said it what it was doing, and the Court said we're not going to look at isolated portions of the text. We're not going to look at what the Court said. We're going to look at the mode of analysis. We're going to look at what the Court actually did. Kagan, did you want to briefly, or maybe you're not the person, maybe it's your colleague, comment on the notion that we don't get to Batson? So, yes, I was going to comment on that, because the Court has to address Batson no matter what, because every single argument that Abbott makes for dodging this issue all depends on what happened after this, by hypothesis, improper jury was constituted. So they made this 50, Rule 50a. But that can't be right. I mean, if in fact we can now look at the trial and say that we would reverse it. No, you can't do that under structural error. What you could do is an argument they never made. If they said the Court liked subject matter jurisdiction or is a pleading matter, they have a faulty case, I'm going to have to give you that one. But when they say I'm going to rely on what happened at trial, under structural error, if you have a biased judge or an improperly constituted jury, the whole trial is guilty. If you're determining it before the case ever, if they could, we could determine it before the case ever went to the jury. No, it has to be before the jury was ever impaneled, because once you have a biased judge, once you have a. A biased judge, we're not talking about a judge. Structural error. We're talking about a jury that never decided anything. If the jury never decided anything, then why would we care what the jury did, who was on the jury? Because. If we could say no matter who the jury was, this case should never have gone to the jury. Because under every structural error case, United States v. Nader, Rose v. Clark, all the plain error cases, you, everything, when it talks about a structural taint, you have to say that when this juror came up, everything that happened, you can't hypothesize what happened at trial, because if a new jury is constituted, different evidence might have gone in, a different argument might have been made, different rulings might have been made. You cannot unwind the apple cart in structural error. This is standard structural error. I've never seen someone make an argument that even though there's structural error, I'm going to talk about what happened at trial. But in any event, a lot of their arguments depend on the jury findings, which I think is patently improper. You cannot so to the extent any of their argument is based on the jury findings, and I think the evidence that was presented at trial, because tomorrow's jury might be different. And the other thing is, if there is a new trial, Abbott's arguments on appeal are going to be different, because the evidence is going to be different. So he'd say, he said, well, why would we have all this trial if you're going to be up here reviewing the same issue? You won't, because you're going to have different evidence. By definition, you get a whole redo. What they're saying is, okay, GSK is right, but get a new jury and replay all the same evidence. And that's not what happens in a retrial. You get to do the whole trial over. You don't just say, all right, here's 12 new juries. We have to redo the trial the exact same way we did it before with the same evidence, same arguments, same lawyers. That's just a structural error. And again, it would also be true on the claims. If I could just go through, March, some on the rebuttal. The Supreme Court in the Johnson, I think it's Johnson v. California in footnote 6, which this Court in Paulino v. Harrison repeated, is that if there's an unusual case where counsel is given an opportunity and then fails to give reasons, that in and of itself makes out a prima facie case and gives rise to a discriminatory intent. It's the same case law that says if you give a pretextual reason, because someone could reasonably assume, had you had a reason, you would have given it. And it's just, in other words, unlike the Fifth Amendment, you can actually draw a negative inference from silence. So this is not like a case where the lawyer was barred from doing it. I will repeat, he finally came around to it in his argument. The judge said the better part of valor might be for you to give a reason. She didn't just say, about to rule, do you want to stand on my ruling? She said, better part of valor, give your reasons, or do you want to make a tactical choice and write up to appeal with me? And this is standard. You make a tactical choice, and counsel should be bound by it. Miller, L., also says that counsel, when challenged under Batson, have a duty to give a reasonably specific and clear answer, and they must stand or fall based on the reasons that they actually gave and what they stated at trial. The other thing that I would just point out is not just that counsel said, I didn't know he was gay, even though that's implausible, and he never said he had bad hearing. He then says, well, Your Honor, he said he had a male partner, and the lawyer says, okay, but it was my only first strike. It's not like I'm up here repeatedly striking people who might be gay. That's not a defense to Batson, is I've only done it once? So again, and I think that also just supports that this he tried, he obviously either couldn't come up with one or made a tactical reason to just take his chances on appeal.   Kagan. Kagan. And my understanding is that Mr. Levin's main argument is really that we ought to back this up into the prima facie case notion. I suppose if he elaborated, he would say, well, this is a rather, without that, it's a rather weak prima facie case because you have one person and the only thing we know that might lead to the inference other than the fact that there was one person. Kagan. Yeah. Well, that's enough for prima facie, but we got identified as gay. Right. Motive and counsel's performance at trial, which the Supreme Court says failure to give an opportunity supports evidence on prima facie case that you intended to give an opportunity. Failure to give a reason when given the opportunity. Yes. Yeah, when you look at the totality of the circumstances, you get to look at not only what counsel said, but what counsel did not say, so silence is evidence. It's silence speaks volumes. Had you had a reason, you would have given it. But I would rely on just motive. Prima facie case, I mean, they had a whole Supreme Court case saying this is just to get in the door. You could not write a published opinion in this case saying this is not a prima facie case without setting back Title VII law decades. But it's not just a case for the trial. It was a case just between the two drug companies, right? There were no individuals in it anymore. Right. Right. About the price of AIDS. But on this bit about let's import totality of the circumstances, step three into step one, all he had 30 minutes to tell you why it mattered that he heard of Kaletra. All he says is I can prove it mattered because my lawyer, my co-counsel asked it. But I never heard him tell you why it mattered. Okay. He heard of the drug Kaletra. I've heard of the drug Lipitor. Now give me why it matters. And I don't know, because he had the opportunity to ask and say, well, what do you know about the drug? And he said, not much. So he still never articulated in the briefs or here at oral argument why it mattered. And I want to, if I can give, if you have any questions on the merits, can I give him 14 seconds? It's up to you. It's up to you. Mike, if you want to have any questions on the merits, but I agree. I just need to get up. You can have three seconds or two minutes. I was going to address, as trial counsel for GSK, I was going to address the breach of contract claim, the North Carolina statute and the antitrust claim. If you can do it in two minutes. I will. Well, I'm most concerned about the liability waiver. I find it relatively hard to believe. As I said, I find the case law extremely confusing, but it just doesn't seem plausible to me that having a grossly negligent breach of contract could be a reason not to enforce a limitation on liability. It was not an exculpatory clause. It was a limitation on liability. And I just would like to know what would be an example of what wouldn't come out of the liability clause and the exclusion clause if we're going to go say that if any intentional or grossly negligent breach blows the limitation on damages. Well, but the phrase gross negligence wasn't just thrown up in the air. In fact, there's not a challenge to the jury instruction, and the Court did provide a jury instruction in terms of what gross negligence meant. Negligence as to what? Negligence as to whether you're breaching the contract or negligence as to whether you're hurting somebody? Well, the definition was either willful misconduct or reckless indifference to the consequences that might flow from it. Right. As to what? As to just whether you're breaching the contract or something as or some injury or harm? It has to do with the breach of the contract. When you breach the contract. That's what I'm doubting. It seems so. So give me an example of a breach of contract that wouldn't come under that. A decision to not accept receipt of. Well, you're violating the contract and you're doing it grossly negligently because you're or even intentionally. I'm not going to accept something you're violating. I'm breaching it. In this case, there was actually evidence of a reckless disregard of the consequences that might flow. In fact, Abbott considered the consequences, and the reason it was, in fact, breached was we wanted to prevent GSK from having a successful launch of the Lexiva product. Well, actually, the jury found otherwise. But the jury did find it was gross negligence on this, which meant either. I know, but it found that that's what's so odd about this. It found that it wasn't trying to manipulate the time and it wasn't trying to, I forget what the other fact-finding was, but it was essentially they were purposely trying to hurt them. And so that's why you're backed into gross negligence and not intent, and I don't understand when you this liability limitation would ever apply. Your Honor, you had asked a question before about the fire alarm case, the Sumner case, and that's the case that said with exculpatory clauses, we will not enforce those as a matter of public policy when there is, in fact, the defendant acted in a manner recklessly indifferent to the consequences that might flow. Because they let up a house burn-up. Actually, it was only a two or three-minute delay in terms of the response from the fire alarm company, but the response was, if you act in a way that's recklessly indifferent to the consequences that might flow, that's sufficient to void the exculpatory clause. That's the statement of the New York law. And by the way, that was the jury instruction, and the jury instructions have not been challenged in this regard. Let me do a quick comment with regard to the antitrust claim, why that went to the trial, went to the jury. The reference to the Govey-Evitt case and the Linkline case, which is essentially the argument being presented by Evitt, they quote the language from Linkline and from Govey-Evitt, but in each one of those cases they say price squeeze standing alone isn't enough, but it price squeeze when there is an antitrust duty to deal is enough. What we wound up trying in our case was the Aspen skiing case, the leading case on refusal to deal, duty to deal. And we went down the specific elements with what the Supreme Court found in the Aspen skiing case, there is no requirement of an ultimate, complete refusal to deal. The requirement is to show that there was a pattern of history of dealing in the past, and then have changed the history of that type of dealing to make it less desirable to deal that way in the future. That's why the antitrust claim correctly went to the jury, as did the case under the Cascade Health Solutions case. I think my two and a half minutes might be up, Your Honor. Are there any other questions? I'd appreciate it. If not, we'll submit the matter. Thank you. I only want to make just one point, because it was raised in a rebuttal about this Kalitra issue, why Abbott might have cared about Kalitra. One of GSK's major themes at trial was Kalitra was a bad drug, it had bad side effects, and the only reason it was succeeding in the market was because of this price up. That was one of their themes at trial. So obviously from that theme, it matters whether someone has heard of Kalitra. And that's what I just wanted to get across. Thank you. Thank you. The case just argued will be submitted. Thank you all for this argument. Very helpful. The Court will stand and recess for the day.
judges: Schroeder, Reinhardt, Berzon